Sandra JACKSON, et al., Plaintiffs,

v.

BELLSOUTH TELECOMMUNICA-TIONS, INC., d/b/a Bellsouth, et al., Defendants.

No. 00–7558 CIV.

United States District Court, S.D. Florida.

Sept. 17, 2001.

---

Daniel S. Rosenbaum, Danielle K. Brewer, Becker & Poliakoff, West Palm Beach, FL, for plaintiffs.

Martin B. Goldberg, Jessica Lima Leyva, Lash & Goldberg, Miami, FL, Miriam R. Nemetz, Mayer Brown & Platt, Washington, DC, Lawrence S. Robbins, Robbins, Russell Englert Orseck & Untereiner, Washington, DC, for Bellsouth Telecommunications.

Miriam R. Nemetz, Mayer Brown & Platt, Washington, DC, Lawrence S. Robbins, Robbins, Russell Englert Orseck & Untereiner, Washington, DC, for Francis B. Semmes.

Deborah Sampieri Corbishley, Pamela I. Perry, Brian F. Spector, Kenny Nachwalter Seymour Arnold Critchlow & Spector, Miami, FL, for Ruden McClosky Smith Schuster & Russell, P.A., Barry Arnold Mandelkorn.

### ORDER ON DEFENDANTS' MOTION TO DISMISS

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court on motions to dismiss filed by Defendants Bellsouth Telecommunications, Inc., Francis Semmes, and Keith Kochler (together, the "Bellsouth defendants") (DE# 110) and by Defendants Ruden McClosky Smith Schuster & Russell, P.A., and Barry A. Mandelkorn (together, the "Ruden McClosky defendants") (DE# 122). A hearing on the motions was held before this Court on September 5, 2001. The Court has reviewed the record, considered submissions of counsel, and is otherwise fully advised in the premises.

#### I. *Background and Procedural History*

The fifty-four plaintiffs in this case consist primarily of former plaintiffs in the underlying action of *Linden Adams, et al. v. Bellsouth Telecommunications, Inc.,* Case No. 96–2473–Civ–Middlebrooks/Brown, but also number among them other individuals who were not officially parties to the *Adams* case, but who claim to have had their unfiled claims against Bellsouth foreclosed by the settlement of that case. The gravamen of the underlying *Adams* action involved claims of racial discrimination in employment practices taken by Bellsouth Telecommunications against its African American employees and applicants.

The plaintiffs in the *Adams* case were represented by, among others, the present Ruden McClosky defendants, who negotiated and completed in August of 1997 a global settlement of that case with those who are at present the Bellsouth defendants. Several serious ethical issues concerning the process and substance of this settlement were subsequently brought to the attention of this Court by the *Adams* plaintiffs, leading this Court to sanction several attorneys involved and further to rule that the individual plaintiffs were entitled to set aside their settlement of the case and prosecute their original claims. However, this allowance was predicated on the express condition that "a plaintiff must first disgorge all benefits either already received or due to be received under the terms of the settlement." *Adams,* Omnibus Order on Magistrate's Report and Recommendations, at 26 (S.D.Fla. Jan. 29, 2001). To date, there is no record evidence that the plaintiffs have in fact disgorged any of the proceeds of the *Adams* settlement, which was not refuted by counsel's representations at argument.

Instead, on October 20, 2000, plaintiffs filed their original complaint in this case. Named as defendants were the BellSouth defendants, the Ruden McClosky defendants, the Law Office of Norman Ganz (one of the plaintiffs' counsel in *Adams*), and Brian Neiman (individually and as an

agent of Norman Ganz).[1] The original complaint asserted claims for violations of 42 U.S.C. § 1981, 18 U.S.C. §§ 1961–1962 (RICO), 18 U.S.C. §§ 1341–1343 (scheme to defraud by use of mails and wire), misrepresentation (fraud in the inducement), negligent misrepresentation, breach of fiduciary duty, conversion, negligent retention, training and supervision, and intentional infliction of emotional distress.

Plaintiffs amended their original complaint as of right before service and filed their Amended Complaint on October 31, 2000. The Amended Complaint asserted claims under seven theories against the Ruden McClosky defendants: (1) violation of 42 U.S.C. § 1981; (2) conspiracy to defraud; (3) violation of 18 U.S.C. §§ 1341–1343; (4) misrepresentation/fraud in the inducement; (5) malpractice; (6) breach of fiduciary duty; and (7) conversion. The Amended Complaint also asserted numerous claims against the Bellsouth defendants, including (1) violation of 42 U.S.C. § 1981; (2) conspiracy to defraud; and (3) violation of 18 U.S.C. §§ 1341–1343. On January 2, 2001, the Bellsouth defendants moved to dismiss the Amended Complaint; on January 12, 2001, the Ruden McClosky defendants also moved to dismiss all seven claims against them. Rather than respond to the motions to dismiss, plaintiffs moved on February 1, 2001 for leave to file a Second Amended Complaint. Leave to amend was granted by Order dated February 20, 2001, and the Second Amended Complaint was deemed filed as of that date.

The Second Amended Complaint contained in total six counts against the various defendants: (1) violation of 42 U.S.C. § 1981; (2) violation of 18 U.S.C. §§ 1961–1962 (RICO); (3) misrepresentation/fraud in the inducement; (4) malpractice; (5) breach of fiduciary duty; and (6) conversion. On March 23, 2001, the Bellsouth defendants moved this Court to dismiss the Second Amended Complaint and on April 12, 2001, the Ruden McClosky defendants again followed suit, moving to dismiss Counts I, II and III of the Second Amended Complaint. On April 30, 2001, plaintiffs, without responding to the motion to dismiss, again moved for leave to amend their complaint. By Order dated May 14, 2001, the Court once again generously granted leave for plaintiffs to file a Third Amended Complaint, but this time stated:

> *Any* claim asserted in any of the prior three complaints, that has been reasserted in the third amended complaint and attacked by pre- or post-answer motion to dismiss, will be subject to dismissal **with prejudice**. Absent extraordinary circumstances, no extensions will be granted to Plaintiffs to respond to any future motions to dismiss.

(italics in original; emphasis added).

On May 18, 2001, plaintiffs filed their Third Amended Complaint, which is the subject of the defendants' current motions to dismiss. The Third Amended Complaint includes claims against both the Bellsouth and Ruden McClosky defendants for violations of: 42 U.S.C. § 1981 (Count I); three federal RICO violations under 42 U.S.C. § 1962(b), (c) and (d) (Counts II through IV); three Florida RICO counts under Fla. Stat. ch. 772.103(2), (3) and (4) (Counts V through VII); and conspiracy to defraud (Count IX). The Third Amended Complaint contains a claim against the Bellsouth defendants alone for tortious interference with advantageous contractual and business relationships (Count XV), as well as claims against the Ruden McClo-

---

1. Plaintiffs voluntarily dismissed Ganz and Neiman. On December 1, 2000, the Court entered Orders of dismissal without prejudice as to these two defendants.

sky defendants alone for fraud in the inducement (Count VIII); breach of contract (Count X); breach of implied duties of good faith and fair dealing (Count XI); breach of fiduciary duty (Count XII); legal malpractice (Count XIII); and conversion (Count XIV).[2]

On June 5, 2001, the Bellsouth defendants moved to dismiss the Third Amended Complaint in its entirety, and on June 14, the Ruden McClosky defendants moved to dismiss Counts I through IX of the Third Amended Complaint while simultaneously answering the other counts. Plaintiffs filed their memoranda of law in opposition to the motions to dismiss, and the defendants then each filed a reply memorandum in support of their motion. On September 5, 2001, the Court heard oral argument on the motions.

## II. *Facts*

Plaintiffs here base their allegations in the Third Amended Complaint on the "fraudulent and collusive activities of Defendants during the settlement of the Adams Case." 3d Am. Compl. ¶ 15. More specifically, they allege that the Bellsouth defendants and the Ruden McClosky defendants worked in concert to cause plaintiffs to enter into a settlement agreement and final release of claims that was well below the actual value of their claims, to defraud the plaintiffs out of a large percentage of the settlement proceeds, and to prevent these and other future plaintiffs from bringing other legal action against the Bellsouth defendants. The plaintiffs also claim that the defendants' actions were based in large part on the fact that all save one of the plaintiffs are African Americans.

In August of 1997, the parties to the *Adams* case entered into a settlement agreement drafted by Bellsouth counsel, Francis Semmes and Keith Kochler, and which provided for the payment by Bellsouth of $1,600,000.00; plaintiffs now claim this amount to be well below the fair value of these original claims. At the time of the settlement, each plaintiff was contacted and told that a "confidential settlement" had been reached and were asked to appear at the law offices of the Ruden McClosky defendants in order to sign a "general release" of all claims against Bellsouth in exchange for a monetary amount of the settlement sum. There, Barry Mandelkorn, an attorney for Ruden McClosky Smith Schuster & Russell, P.A. and one of the current Ruden McClosky defendants, told each plaintiff that the total amount of the settlement could not be disclosed, and further advised each plaintiff that the release required him or her not to discuss the amount he or she received under the agreement. At the Bellsouth defendants' insistence, the general release also included a provision stating that breach of this confidentiality provision could result in termination of employment at Bellsouth. Plaintiffs claim that the defendants inserted this addendum to "conceal the fraudulent activities of Defendants and to keep the amount and terms of the settlement secret from Plaintiffs in order to further the conspiracy perpetrated by Defendants upon the Plaintiffs." *Id.* ¶ 44. Most plaintiffs signed the general release (the "Group A" plaintiffs) although four individuals did not (the "Group B" plaintiffs).

Upon entering into the global settlement agreement with Bellsouth, the defendants also entered into two separate agreements alleged by the plaintiffs to be unethical and

---

**2.** This Order does not address the state-law claims asserted against the Ruden McClosky defendants in Counts X through XV of the Third Amended Complaint, as those claims were not attacked by these defendants in their motion to dismiss.

unlawful. First, the Ruden McClosky defendants agreed not to sue Bellsouth for any claims of employment discrimination for a period of one year. Plaintiffs here claim that "[t]he effect of this side agreement was to impede the ability of [those plaintiffs who signed the general release] to enforce the terms" of the settlement and that this provision of the settlement was never disclosed to them. *Id.* ¶ 42. Second, the Bellsouth and Ruden McClosky defendants entered into a four-year "consulting agreement," under the terms of which Bellsouth paid $120,000 taken from the settlement proceeds directly to the Ruden McClosky defendants and without the plaintiffs' knowledge. Plaintiffs allege that the defendants took this action in order to create a conflict of interest that would disqualify the Ruden McClosky defendants from representing any plaintiff in future actions against BellSouth, which in effect " 'bought' the loyalty of Plaintiffs' attorneys from the Plaintiffs, to whom their duty was owed." *Id.* ¶ 49.

### III. *Legal Standard*

For the purpose of a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint must be construed in the light most favorable to the plaintiff, and all facts as alleged by the plaintiff must be accepted as true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Brooks v. Blue Cross & Blue Shield of Florida,* 116 F.3d 1364, 1369 (11th Cir.1997) (per curiam). Although such motion does present a potential obstacle to the plaintiff's ability to proceed further with the prosecution of his or her case, it is not an extremely onerous burden that is placed upon the plaintiff at this time, for the complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Further, the complaint should not be dismissed because the plaintiff's claims do not support the specific legal theory upon which he or she relies; the court must itself determine whether the allegations provide a basis for relief on *any* possible theory of recovery. *See, e.g., Brooks,* 116 F.3d at 1369, *citing Robertson v. Johnston,* 376 F.2d 43 (5th Cir.1967). In sum, underpinning this legal framework is the thought that a motion to dismiss "is viewed with disfavor and rarely granted." *Future Tech Int'l, Inc. v. Tae IL Media, Ltd.,* 944 F.Supp. 1538, 1561 (S.D.Fla. 1996).

It should be kept in mind, however, that in considering a motion to dismiss, a court "will not accept, without more, conclusory allegations or legal conclusions masquerading as factual conclusions." *Robinson v. Jewish Ctr. Towers,* 993 F.Supp. 1475, 1476 (M.D.Fla.1998); *see also Cummings v. Palm Beach County,* 642 F.Supp. 248, 249 (S.D.Fla.1986) (noting that although "[t]he federal rules of pleading are liberal, . . . something more than conclusory allegations of racial and age discrimination are required.").

Additionally, the court is somewhat limited in what it may legitimately consider when assessing a motion to dismiss. "In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.,* 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd,* 84 F.3d 438 (11th Cir.1996), *quoting* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 299 (1990).

This catalog is further expanded "where the plaintiff refers to certain documents in the complaint and these documents are central to the plaintiff's claim, [for] then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Brooks*, 116 F.3d at 1369. With this standard in mind, we turn to the analysis of the case at hand.

## IV. Count I: 42 U.S.C. § 1981

 In order to make out a claim under 42 U.S.C. § 1981,[3] a plaintiff must allege (1) that the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerns one or more of the activities enumerated in the statute. *See Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1354, 149 L.Ed.2d 285 (2001). No party to the present case disputes that the plaintiffs, African Americans, are members of a racial minority.[4] Further, the Third Amended Complaint also properly alleges that the discrimination concerned one or more of the enumerated areas within the

statute: the right to make and enforce contracts, to sue, be parties, and give evidence as involved in the final settlement agreement. *See* 3d Am. Compl. ¶¶ 57–58. As was the case in *Rutstein*, then, "[t]he critical element, obviously, is the second." 211 F.3d at 1235.

 Section 1981 "can be violated only by purposeful discrimination." *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1350 (11th Cir.1983). In support of their claim under this section, plaintiffs allege that the defendants' actions "were motivated solely by the race of the Plaintiffs"; that the defendants, "because the Plaintiffs are African Americans, presumed that the Plaintiffs were not smart enough or sophisticated enough to inquire or insist on disclosure of the settlement terms and amounts," 3d Am. Compl. ¶ 59(b); and that had the plaintiffs not been African Americans, the defendants would not have taken such a course of action. Plaintiffs further state that "the treatment of the Plaintiffs in this case by the Defendants differs markedly from their treatment of plaintiffs in other cases litigated by these attorneys in the past." *Id.* ¶ 60.[5]

---

**3.** Section 1981 states, in relevant part:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

. . .

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

**4.** The Court notes that the Third Amended Complaint carves out from Count I the only white plaintiff, Donald McGuckian.

**5.** The full text of Paragraph 60 reads as follows:

Furthermore, the treatment of the Plaintiffs in this case by the Defendants differs markedly from their treatment of plaintiffs in other cases litigated by these attorneys in the past. The Defendants have litigated several lawsuits, both in the federal and state courts of Florida and elsewhere, in which the plaintiffs were similarly situated with the Plaintiffs in this case, but have never before conspired and colluded to engage in the activities set forth in Paragraphs

Concerning these rather conclusory allegations of discriminatory intent in Paragraph 59(b) of the Third Amended Complaint as set forth above, the Court views these as legally insufficient to make out a claim under section 1981 that is able to withstand defendants' motion to dismiss. In *Cummings v. Palm Beach County*, 642 F.Supp. 248 (S.D.Fla.1986), the court dismissed the complaint because the plaintiff alleged no facts that supported his claims of racial and age discrimination. The court cogently reasoned that in order to comply even with the fairly liberal standard of "notice pleading" used today, such facts are required because they "enable the defendant to focus on these practices in order to respond to the charges and assure the court that the claim has some basis in fact," facts which were missing in that case. *Id.* at 249. Plaintiffs' allegations here sweepingly state that the defendants' actions "were motivated solely by race" and that the defendants simply presumed these African American clients to be less intelligent than others. As in *Cummings*, this Court too is of the mind that "something more than [such] conclusory allegations of racial ... discrimination are required." *Id.; Faulk v. City of Orlando*, 731 F.2d 787, 790 (11th Cir.1984) (upholding the district court's dismissal of plaintiff's section 1981 claims against individual defendants because "[n]owhere in his pleadings did appellant allege any ac-

tion by the individual defendants based on appellant's race which could be characterized as purposeful discrimination violative of ... section 1981"); *accord The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989) (concluding that section 1981 claim could not withstand motion to dismiss "[a]bsent some meaningful, fact-specific allegation of a causal link between defendants' conduct and plaintiffs' race"). Notwithstanding this Court's duty to view the facts in the light most favorable to the plaintiffs, such blanket assertions of racially discriminatory motivation, painted with a broad brush but unsupported by hard facts set forth in the complaint, are insufficient to make out a claim under section 1981.

The plaintiffs do not, however, rest solely upon direct allegations of racially discriminatory intent, but rather further assert that similarly situated nonminority clients have not been treated equally by the Ruden McClosky defendants.[6] *See* 3d Am. Compl. ¶ 60. In support of this claim, plaintiffs rely heavily upon *Faulk v. City of Orlando*, 731 F.2d 787 (11th Cir.1984), in which a white male who worked as a heavy equipment operator for the Orlando Waste Water and Sanitation Departments was discharged form his employment after being involved in numerous accidents. *See id.* at 788. He then instituted a section 1981 action against the City and three of its officials, alleging racial discrimination.

---

1 through 53 and 59 above, nor has their individual conduct in litigating past lawsuits been so unethical and so egregious as to warrant the appointment of a Special Master to investigate their fraudulent conduct until the Underlying Case. In fact, Becker & Poliakoff, P.A. has litigated and settled numerous lawsuits in which the opposing party was represented by Ruden and its attorneys, including Mandelkorn, and Ruden and Mandelkorn have not engaged in the conduct alleged above.

6. The Court notes here that the plaintiffs made virtually no attempt to connect the Bellsouth defendants to this line of reasoning vis-a-vis discriminatory intent under section 1981. Although Paragraph 60 of the Third Amended Complaint, which sets forth the only surviving claim under section 1981, loosely states that "the Defendants" treated similarly situated nonminority clients differently, it is apparent from the rest of that paragraph that these allegations are pointed solely at the Ruden McClosky defendants. *See supra* note 5.

In his complaint, he claimed that he was discriminated against because he was white when he was discharged from employment due to the accidents in which he was involved, while African American employees who had also been involved in multiple accidents were treated differently in that they were instead allowed to "drop back as a helper" and were not discharged. Noting that "a plaintiff need not prove his whole case in his complaint," *id.* at 791, the Eleventh Circuit reversed the trial court's dismissal of the section 1981 claims as against the City based upon the plaintiff's sufficient allegations of facts showing that similarly situated minority employees were treated differently by the City. *See id.*

Like the plaintiff in *Faulk*, who, in asserting claims against the City of Orlando, was able sufficiently to plead discriminatory action taken against him by alleging differential treatment of similarly situated minority employees, the plaintiffs here involved point, albeit rather broadly, to instances of similarly situated individuals being treated differently by the Ruden McClosky defendants. Although the furthest plaintiffs are able to take this argument is to allege generally that the defendants "have litigated several lawsuits, both in the federal and state courts of Florida and elsewhere, in which the Plaintiffs were similarly situated with the Plaintiffs in this case, but have never before conspired or colluded" to discriminate against their clients based on race, 3d Am. Compl. ¶ 60, this could allow the plaintiffs to go forward with their 1981 claim. *See Ferrill v. The Parker Group*, 168 F.3d 468, 472 (11th Cir.1999) (a plaintiff "who ad-

duces direct evidence of disparate treatment on the basis of race makes out a prima facie case of intentional discrimination."); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1562 n. 15 (11th Cir. 1987) ("Proof of a *prima facie* case does not require direct proof of intent to discriminate; evidence of disparate treatment from which the trier of fact may infer discrimination is sufficient."), *citing United States Postal Svc. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 & n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Although the Court feels that the question of the sufficiency of the plaintiffs' factual pleadings is not an entirely clear one, given the disfavor shown to granting motions to dismiss and the possibility, albeit rather remote, it seems of discovery buttressing these contentions, plaintiffs' allegations of disparate treatment at the hands of the Ruden McClosky defendants based on their status as African Americans, *see* ¶¶ 59(c)–60, can make out a case under section 1981 that is able to survive the defendants' motion to dismiss.[7] However, because plaintiffs do not sufficiently allege any such disparate treatment taken by the Bellsouth defendants in negotiating settlements with other similarly situated nonminority individuals, the section 1981 claim against these defendants shall be dismissed.

## V. Plaintiffs' State and Federal RICO Claims (Counts II–VII)

Counts II–VII of the plaintiffs' Third Amended Complaint are based upon the federal Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962(b)-(d),[8] and the Florida

---

**7.** On a motion to dismiss, "[t]he issue is not whether the plaintiff will ultimately prevail, but 'whether the claimant is entitled to offer evidence to support the claims.'" *Vamper v. United Parcel Svc., Inc.*, 14 F.Supp.2d 1301, 1303 (S.D.Fla.1998), *quoting Little v. City of*

*No. Miami*, 805 F.2d 962, 965 (11th Cir. 1986).

**8.** The pertinent portions of the federal RICO statute read as follows:

(b) It shall be unlawful for any person through a pattern of racketeering activity or

state-law Civil Remedies for Criminal Practices Act, Fla. Stat. ch. 772.103(2)-(4), which is often referred to as the Florida RICO Act. The Eleventh Circuit has explained that the interpretation of this Florida provision "is informed by case law interpreting the federal RICO statute ... on which Chapter 772 is patterned." *Jones v. Childers,* 18 F.3d 899, 910 (11th Cir.1994); *Florida Software Sys., Inc. v. Columbia/HCA Healthcare Corp.,* 46 F.Supp.2d 1276, 1284 (M.D.Fla.1999) ("[The] Florida RICO statute is patterned after the Federal RICO statute, and the Florida courts often look to the Federal RICO decisions for guidance in interpreting and applying the act."). Informed by these guideposts, this Court assesses the federal and state-law claims together, and Counts II–VII shall stand or fall as a whole.

▆▆▆ To satisfy the crucial "pattern of racketeering activity" requirement,[9] plaintiffs must allege that: (1) the defendants committed two or more predicate acts within a ten-year time span;[10] (2) the predicate acts are related to one another; and (3) the predicate acts demonstrate a continuing nature of criminal conduct. *See, e.g., H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239–43, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496–97, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Jones v. Childers,* 18 F.3d 899, 910–11 (11th Cir.1994); *see also State v. Lucas,* 600 So.2d 1093, 1094 (Fla.1992) (adopting the criteria set forth in *H.J. Inc.*).

First, the plaintiffs must allege that the defendants committed the requisite predicate acts as delineated in section 1961.[11] Most important to the present discussion, section 1961 defines the predicate acts of "racketeering activity" to include any acts "chargeable" or "indictable" under certain state and federal laws, including the federal mail and wire fraud statutes. *See* 18

---

through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debts.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.
18 U.S.C. § 1962(b)-(d).

9. *See supra* note 8.

10. It should be noted that, while "two [predicate] acts are necessary, they may not be sufficient." *Jones v. Childers,* 18 F.3d 899, 911 (11th Cir.1994), *quoting Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496–97, 105 S.Ct. 3275 (1985). Rather, the predicate offenses also must satisfy the relationship plus continuity test, the second and third prongs as set forth above. *See H.J. Inc.,* 492 U.S. at 239–43, 109 S.Ct. 2893. In the Eleventh Circuit, allegations of two or more related acts of "racketeering" are sufficient to satisfy the federal "pattern" requirement even if the defendants engaged in such solely in the course of a single scheme or episode. *See, e.g., Bank of America v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir.1986). Under Florida's RICO laws, "crimes committed at the same time cannot qualify as separate incidents for purposes of proving racketeering conduct ...." *State v. Marks,* 758 So.2d 1131, 1138 (Fla. 4th DCA 2000), *quoting State v. Lucas,* 600 So.2d 1093, 1095–96 (Fla.1992).

11. Moreover, the plaintiffs in a civil RICO must allege the predicate acts "with enough specificity to show that there is probable cause the crimes were committed. That determination is possible only if the factual basis of the predicate acts is set out with specificity." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs,* 640 F.Supp. 1168, 1175 (S.D.Fla.1986).

U.S.C. § 1961; *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 640 F.Supp. 1168, 1171 (S.D.Fla.1986). It is upon these specific predicate acts that plaintiffs base their claims of federal and state RICO violations. Specifically, plaintiffs allege that the defendants "intentionally participated in a scheme to defraud [plaintiffs who had signed the general release] and to obtain money or property by means of false or fraudulent pretenses, representations, or promises." 3d Am. Compl. ¶ 66. They then list with particularity the instances in which the U.S. Mails and wire services were used in furtherance of this alleged scheme, including the mailing of letters between the Ruden McClosky and Bellsouth defendants, the mailing of the putatively undervalued settlement checks, and repeated use of the telephones for communication. *See id.* ¶ 67(a)-(h).

■ "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991); *see also id.* ("The elements of mail and wire fraud are identical."). Plaintiffs' Third Amended Complaint sufficiently alleges that the Ruden McClosky and Bellsouth defendants intentionally participated in such a scheme by colluding to defraud plaintiffs out of the fair value of their claims' settlement. The Bellsouth defendants attempt to refute this by claiming that the complaint contains no allegations that they knew of the communications between the plaintiffs and their attorneys (the Ruden McClosky defendants), and

therefore that the Bellsouth defendants did not act with a "conscious knowing intent to defraud." *Id.* at 1499. However, this Court feels that the Third Amended Complaint contains sufficient allegations, for purposes of surviving a motion to dismiss, that the Bellsouth defendants knowingly acted in concert with the Ruden McClosky defendants in using the mails to defraud the plaintiffs out of the legitimate value of the settlement of their claims. *See* 3d Am. Compl. ¶ 66(a)-(c); *cf. United States v. Johnson*, 700 F.2d 699, 701 (11th Cir.1983) ("When a defendant is proved to be a participant in a scheme to defraud and a document is mailed in furtherance of the scheme, . . . he may be convicted of mail fraud, . . . even if he did not personally mail the document."). Therefore, the Third Amended Complaint does not fail for lack of pleading the requisite predicate acts.[12]

■ Second, and most contentiously debated between the opposing parties, the RICO claims must establish the continuity prong of the "relationship plus continuity" test set out by the Supreme Court in *H.J. Inc.*, 492 U.S. at 239–43, 109 S.Ct. 2893. In that case, the Court held that to prove a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. 2893 (emphasis in original); *see also Jones v. Childers*, 18 F.3d 899, 911 (11th Cir.1994). In so holding, the Court wrote that continuity can be shown through either (1) repeated predicate acts over a

---

**12.** Because the Court finds a lack of the continuity requirement and dismisses the federal and state RICO claims on that basis, we refrain from now delving into the separate issue of whether the alleged predicate acts are sufficiently "related" for these purposes. *See* Fla. Stat. § 772.102(4) (stating that the incidents

must "have the same or similar intents, results, accomplices, victims or methods of commission or . . . otherwise [be] interrelated by distinguishing characteristics and [ ] not isolated incidents,"); *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893.

closed but substantial period of time that demonstrate defendant's long-term criminal activity; or (2) where a RICO action is brought before continuity can be established, a *threat* of continuity can be demonstrated. *See H.J. Inc.*, 492 U.S. at 241–42, 109 S.Ct. 2893 ("threat" of continuity can be established where "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or where "the predicate acts or offenses are part of an ongoing entity's regular way of doing business"). Because the plaintiffs' Third Amended Complaint fails sufficiently to allege the "continuity" element of the state and federal RICO laws, these claims shall be dismissed against all defendants.

██ First, continuity may be established by showing the defendants engaged in "a series of related predicates extending over a *substantial period of time.*" *Id.* at 242, 109 S.Ct. 2893 (emphasis added). In fleshing out the precise contours of this "closed-ended continuity" requirement, the federal courts of appeals have grounded their reasoning in the Supreme Court's admonition in *H.J. Inc* that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* In *Aldridge v. Lily–Tulip. Inc. Salary Retirement Plan Benefits Cmte.*, 953 F.2d 587 (11th Cir.1992), the Eleventh Circuit found itself confronted with the question of how long an alleged illegal activity must be carried on before it qualifies under this closed-ended continuity requirement. In that case, the plaintiffs alleged that the defendant-employer committed predicate RICO violations when it altered its vacation policy to require vacation time to be taken in the year in which it was earned, "essentially wiping off the slate any vacation earned in" the year in which the policy took effect. *Id.* at 589. In support of their RICO claims, the *Aldridge* plaintiffs claimed that the defendant used the mails for a period of approximately six months in furtherance of its plan to defraud plaintiffs of their vacation benefits. *See id.* at 593. Upon these facts the Eleventh Circuit concluded that the alleged illegal scheme "was accomplished in too short a period of time ... in order to qualify it as a pattern of racketeering activity." *Id.; see also GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467–68 (2d Cir. 1995) (collecting cases from various federal courts of appeals and noting that the courts "have consistently refused to treat predicate acts occurring over a similar (or even longer) period of time [eleven months] a 'pattern of racketeering activity' under RICO."). In the case at bar, plaintiffs claim that the mail fraud violations were "repeated over a substantial period of time," 3d Am. Compl. ¶¶ 70,76,81,86,91,-96, although the specific factual allegations as pleaded in Paragraph 67 show that the mails were used in furtherance of the scheme to defraud first on April 22, 1997, and last on September 29, 1997.[13] This is a period of just slightly over five months and therefore, under *Aldridge*, fails to constitute the closed-ended continuity requirement necessary to sustain a claimed RICO violation.

██ As mentioned above, however, the continuity requirement may also be satisfied by proving "open-ended continuity," which the Supreme Court defined as either a threat of repetition of the illegal predicate acts in the future or that the illegal

---

**13.** It appears that plaintiffs also include the defendants' mailing of tax forms, which occurred in January of 1998, in the predicate acts. Even conceding this as part of the predicates, the time period alleged here covers only nine months– still too short to qualify under closed-ended continuity.

acts are part of the defendant's regular way of doing business. *See H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. 2893. The possibility of showing continuity in this manner makes eminent sense; it allows legitimate RICO claims to be brought while obviating the need for a plaintiff with such a claim to sit on her hands until the time period required for closed-ended continuity has elapsed.

Plaintiffs themselves dispose of the second branch of open-ended continuity, that the allegedly illegal activity is part of the defendants' regular way of doing business, by stating that the defendants "have never before conspired and colluded to engage in the activities" alleged to constitute the predicate acts of mail and wire fraud. 3d Am. Compl. ¶ 60. Obviously, plaintiffs cannot and do not thereafter turn around and claim that these illegal activities comprised part of the Bellsouth or Ruden McClosky defendants' regular way of doing business.

▮ The plaintiffs do, however, attempt to plead open-ended continuity in the complaint by stating that the mail fraud "poses a threat of continued criminal activity in the future." *Id.* ¶ 70. Further, the plaintiffs allege that the purpose of the four-year "consulting agreement" entered into by the Bellsouth and Ruden McClosky defendants was to "creat[e] a conflict of interest for Plaintiffs' attorneys [the Ruden McClosky defendants] and to prevent future representation of any plaintiffs in legal action against Bellsouth." *Id.* ¶ 48; *see also id.* ¶¶ 51–52. However, plaintiffs make no allegations that the predicate acts themselves, *viz.*, mail and wire fraud, will continue into the future. Although plaintiffs allege that the defendants originally committed mail and wire fraud to accomplish their fraudulent scheme, the Court can find nowhere in the Third Amended Complaint any assertion that the defen-

dants will employ the mails or wire services in the future in furtherance of said scheme. *See Riggs Nat'l Bank of Washington, D.C. v. Freeman*, 684 F.Supp. 1086, 1088 (S.D.Fla.1988) ("The purpose of the enterprise in the instant action had an obvious terminating goal or date ... [including] covering up the trail. There is nothing in Plaintiff's second amended complaint that indicates a threat of continuing criminal activity beyond this terminating goal."). Therefore, even reading the complaint in the light most favorable to the plaintiffs, as need be done in considering a motion to dismiss, the complaint fails to allege open-ended continuity under the federal and Florida RICO statutes.

Furthermore, even if the plaintiffs had pleaded facts showing that the defendants would repeat the predicate acts of mail and wire fraud in a future effort to hide the original wrongdoing, the Eleventh Circuit has held that such attempts merely to conceal an underlying illegal predicate act are not sufficient to establish the open-ended continuity required for RICO claims. *See Aldridge*, 953 F.2d at 593–94. In *Aldridge*, the plaintiffs claimed that the defendant-employer utilized the mails for a period of five years in an attempt to conceal from its employees the underlying "fraudulent taking" of the employees' vacation time. *See id.* at 592. On these facts the Eleventh Circuit held that the defendant's acts "after the initial taking were allegedly performed in order to conceal their wrongdoing; they did not threaten future harm or a repetition of their illegal acts," and therefore that the district court erred in denying the defendant's motion to dismiss the RICO claim. *Id.* at 594. Like the defendant's actions in *Aldridge*, the most plaintiffs could be considered to allege here is that the Bellsouth and Ruden McClosky defendants would use the mails and wires in attempting to conceal the

initial fraudulent act of duping the plaintiffs out of the fair value of the settlement of their claims; under existing precedent, this is not enough to establish open-ended continuity.

 Finally, as to the claims of conspiracy under the federal and state RICO laws, these too are dismissed. Section 1962(d) of the federal law and the analogous chapter 772.103(4) of Florida law are violated by "conspir[ing] to violate" any of the substantive provisions of the respective RICO laws. Although plaintiffs' Third Amended Complaint alleges that the defendants "conspired and confederated" to violate the RICO laws, 3d Am. Compl. ¶ 82, this is not the case. The parties in their respective motions and memoranda on the subject debate at length the possibility of a conspiracy violation in the absence of a violation of the underlying offense. However, in light of the foregoing discussion, it is apparent to the Court that the only goal for which the defendants allegedly agreed to strive was to conceal the original fraud on the plaintiffs. Because, as has been fleshed out above, this is not in violation of the federal or Florida RICO statutes, there was no agreement or conspiracy to that end. *See, e.g., United States v. Vaghela,* 169 F.3d 729, 732 (11th Cir.1999) ("To be guilty of conspiracy, . . . parties must have agreed to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law."). Although it may be true that "it is not necessary for a party to be guilty of the underlying RICO claims in order to be found guilty of conspiracy under the RICO Stat-

ute," Pls.' Mem. of Law in Opposition to Ruden McClosky Defs.' Mot. to Dismiss Third Am. Compl. at 18, it *is* necessary that the complaint first allege a viable claim that the underlying act was illegal under the substantive law. *See Colonial Penn Ins. Co. v. Value Rent–A–Car Inc.,* 814 F.Supp. 1084, (S.D.Fla.1992) ("In order to establish a RICO conspiracy, there must be evidence of an agreement to violate a substantive provision of the statute."). Because plaintiffs' RICO claims fail in this respect in that they do not establish that the defendants' actions violated the RICO laws, the conspiracy claims premised thereupon also must fall.

## VI. *Plaintiffs' Fraud–Based Claims (Counts VIII–IX)*

 Count VIII of the Third Amended Complaint, asserted against the Ruden McClosky defendants alone, alleges fraud in the inducement.[14] These defendants base their motion to dismiss this count for failure of the plaintiffs to plead such fraud with sufficient particularity.

 In light of the severity of an allegation of fraud, Rule 9(b) of the Federal Rules of Civil Procedure provides in pertinent part:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

"This Rule 'serves an important purpose in fraud actions by alerting defendants to the "precise misconduct with which they are charged" and protecting defendants against "spurious charges of immoral and fraudulent behavior." ' " *Brooks v. Blue*

---

**14.** The elements of fraud in the inducement are: (1) a misrepresentation of material fact; (2) that the representer knew or should have known of the statement's falsity; (3) that the representer intended that the representation would induce another to rely on it; and (4) that the plaintiff suffered injury in justifiable reliance on such representation. *See Hillcrest Pacific Corp. v. Yamamura,* 727 So.2d 1053, 1055 (Fla. 4th DCA 1999). A material omission can also support a claim for fraudulent inducement. *See Allen v. Stephan Co.,* 784 So.2d 456 (Fla. 4th DCA 2000).

*Cross Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1370–71 (11th Cir.1997) (per curiam), *quoting Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir.1988). However, the strict application of Rule 9(b) must not be allowed to vitiate the overall concept of notice pleading. *See, e.g., Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001). This Rule is satisfied if the complaint sets forth (1) the exact statements or omissions made, (2) the time and place of each such statement and who made the statement or omission, (3) the substance of the statement and how it misled the plaintiff, and (4) the defendants' gain due to the alleged fraud. *See Brooks*, 116 F.3d at 1371; *Rentclub, Inc. v. Transamerica Rental Fin. Corp.*, 775 F.Supp. 1460, 1462 (M.D.Fla.1991). It is with this standard in mind that the Court assesses the viability of this count of the plaintiffs' complaint.

In Count VIII, plaintiffs allege that, "At the time of entering into the Settlement Agreement with Bellsouth, Ganz, [and the Ruden McClosky defendants] falsely represented to [plaintiffs who signed the general release], among other things," and then go on to list the misrepresentations that form the basis of the fraud claim. 3d Am. Compl. ¶ 102. Earlier in the complaint, plaintiffs state that the Ruden McClosky defendants contacted the plaintiffs in August 1997 concerning the Settlement Agreement. *See* 3d Am. Compl. ¶¶ 36–37. Additionally, the complaint goes on to state specifically that Mr. Mandelkorn, on behalf of his law firm, "falsely told" the plaintiffs, "[d]espite repeated requests" for disclosure of the settlement amount, that "the total settlement could not be disclosed to them because it was confidential," *id.* ¶ 39, and that because the plaintiffs never knew the full amount of the settlement, they could not know that this amount was well below the actual aggregate value of the plaintiffs' claims.

*See id.* ¶ 38. Finally, plaintiffs allege that defendants' statements were made "to conceal the fraudulent activities of Defendants and to keep the amount and terms of the settlement secret from Plaintiffs in order to further the conspiracy ...." *Id.* ¶ 44.

Based on the foregoing allegations culled from the Third Amended Complaint, this Court feels that the plaintiffs have met their pleading burden as clarified in *Brooks*. The complaint contains the statements made, the time and place of such statements, who made them, the contents of the statements, how it misled the plaintiffs, and the defendants' goal in making such misrepresentations. Furthermore, and contrary to the assertions of the Ruden McClosky defendants, this count does not impermissibly "lump all the defendants together." Ruden McClosky Defs.' Mot. to Dismiss Third Am. Compl. at 25, *quoting In re Urcarco Secs. Litig.*, 148 F.R.D. 561, 569 (N.D.Tex.1993). Although in Paragraphs 102–05 plaintiffs do "lump" Mr. Ganz in with the other defendants, this Court is of the view that, in light of the specific allegations in Paragraph 39 clarifying that it was Mr. Mandelkorn who made the statements to the plaintiffs, this "lumping" is not fatal to the overall claim. Count VIII is asserted against the Ruden McClosky defendants alone, as acting through Mr. Mandelkorn. Accordingly, Count VIII survives the current motion to dismiss.

 The Ruden McClosky defendants further claim in their motion to dismiss that Count IX, Conspiracy to Defraud, must be dismissed on the grounds that the plaintiffs' complaint fails specifically to allege which of these defendants obtained which plaintiffs' signatures on the Settlement Agreement. Paragraph 109 of the Third Amended Complaint states that the Bellsouth defendants "drafted the Set-

tlement Agreement, and Ganz, [and the Ruden McClosky defendants] presented it to Plaintiffs for their signatures." The defendants assert that conspiracy claims must also comply with the heightened pleading requirements of Rule 9(b). "Although Rule 9(b) does not list conspiracy as a cause of action which must be pled with particularity, a complaint will be dismissed where the allegations are conclusory and vague." *Primerica Financial Svcs., Inc. v. Mitchell,* 48 F.Supp.2d 1363, 1369 (S.D.Fla.1999), *citing Fullman v. Graddick,* 739 F.2d 553, 557 (11th Cir. 1984). The crux of the matter is that the defendants must be put on notice as to the nature of the conspiracy alleged to exist. *See id.* Here, the complaint is sufficient to put defendants on notice of the nature of the conspiracy claim. For example, plaintiffs' allegations in Paragraphs 43–44 of the complaint describe the confidentiality clause of the settlement agreement (allegedly designed to cover up the underlying fraud concerning the settlement amount), and the coordinated actions of the Rudan McClosky and Bellsouth defendants taken in creating that clause. Therefore, this Court does not feel that the allegations of a conspiracy to defraud as set forth in Count IX of the Third Amended Complaint are so "conclusory and vague" as to warrant dismissal at this stage of the proceedings.

## VII. *Bellsouth Defendants' Litigation Privilege Claim*

 Counts IX and XV are plaintiffs' claims of conspiracy to defraud and tortious interference with advantageous contractual and business relationships, respectively. In opposition to these claims, the Bellsouth defendants assert that they are barred by Florida's litigation privilege. This absolute immunity, originally covering only defamatory statements made in the course of judicial proceedings, was subsequently extended by the Supreme Court of Florida to "any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior ...." *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co.,* 639 So.2d 606, 608 (Fla.1994). Additionally, "the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action," *Mitchell v. Forsyth,* 472 U.S. 511, 525, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and is thus "an *immunity from suit* rather than a mere defense to liability." *Id.* at 526, 105 S.Ct. 2806.[15]

Plaintiffs contend that the litigation privilege as set forth in *Levin* does not apply to the settlement proceedings and fraud claims arising therefrom because "the actions of the Defendants in this matter only tangentially, at best, had anything to do with settling the lawsuit." Pls.' Response to Bellsouth Defs.' Mot. to Dismiss 3d Am. Compl. at 20. But the occurrences from which plaintiffs' claims arise have *everything* to do with the settlement of a lawsuit, which is a crucial element in concluding the vast majority of civil litigation today. Moreover, as the Bellsouth defendants point out, plaintiffs explicitly concede that the Third Amended Complaint is predicated on "the injustices [the plaintiffs] suffered as a result of the fraudulent and collusive activities of Defendants during the settlement of the Adams Case." 3d Am. Compl. ¶ 15. The plaintiffs try to cloud this analysis by stating the obvious:

---

**15.** For these reasons, the litigation privilege is properly dealt with at the motion to dismiss stage.

that "[c]learly, one litigant's running down with their vehicle of another litigant in the parking lot after a hearing would not be protected by the litigation privilege." Pls.' Resp. to Bellsouth Defs.' Mot. to Dismiss 3d Am. Compl. at 20. Such a tort, having no relation to the merits of the underlying proceeding, clearly would not be considered to have occurred "during the course of a judicial proceeding"; settlement negotiations, on the other hand, and the communications between opposing counsel occurring during these negotiations, are an integral part of the judicial process. Therefore, this Court holds that Florida's absolute litigation privilege bars the plaintiffs from asserting Counts IX and XV against the Bellsouth defendants and are dismissed accordingly.[16]

The only opposition plaintiffs make to this conclusion is that the case of *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So.2d 306 (Fla.2000), holds that a fraud in the inducement claim is not barred by a release of all claims, and therefore that the litigation privilege does not operate to bar claims based upon actions taken by opposing parties in a lawsuit. *Mazzoni*, however, is not applicable to the case at bar. As has been recently stated, in *Mazzoni* "[t]he Supreme Court of Florida did not examine the possibility

of immunity for litigation conduct, and to say that they impliedly denied the possibility of immunity in these cases is to read too much into the *Mazzoni* opinion." *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 135 F.Supp.2d 1271, 1280 (S.D.Fla.2001). The heart of the *Mazzoni* case involved the scope of the release-of-claims provisions at issue, not the application of Florida's litigation privilege. Therefore, this case does not alter the above reasoning.

█ Finally, the Bellsouth defendants assert in their motion to dismiss that the plaintiffs' claims are barred by the general releases that were signed as part of the global Settlement Agreement.[17] Even assuming that the plaintiffs were fraudulently induced into signing the general releases,[18] "[i]t is axiomatic that fraudulent inducement renders a contract voidable, not void." *Mazzoni*, 761 So.2d at 313. Further, "[a] prerequisite to rescission is placing the other party in status quo," *id.*, meaning that plaintiffs would have to tender the benefits of the voidable contract (here, the monies received under the Settlement Agreement) to the defendants in order to rescind said contract and its release provision. As this Court stated in a previous Order, "in order to opt out of their prior settlement, . . . a plaintiff must

---

**16.** The Court here points out that, as was the case in *Levin*, "just as remedies for perjury, slander, and the like committed during judicial proceedings are left to the discipline of the courts, the bar association, and the state, other tortious conduct occurring during litigation is equally susceptible to that same discipline." *Levin*, 639 So.2d at 608.

**17.** Although plaintiffs assert that the releases are not properly before the Court in that they were not attached to or referred to in the Third Amended Complaint, this objection is flawed. "[W]here the plaintiff refers to certain documents in the complaint and these documents are central to the plaintiff's claim, then the Court may consider the documents

part of the pleadings for purposes of Rule 12(b)(6) dismissal . . . ." *Brooks*, 116 F.3d at 1369. In the Third Amended Complaint, plaintiffs repeatedly refer to the releases at issue. *See, e.g.*, 3d Am. Compl. ¶ 40 ("All members of Plaintiff 'Group A' signed the general release . . . .").

**18.** Only the Group A plaintiffs signed the general release; the Group B plaintiffs, consisting of four individuals, did not. Therefore, this discussion applies only to Group A plaintiffs. However, because of the conclusion that these claims are barred by Florida's litigation privilege as applied to the Bellsouth defendants, this distinction is irrelevant.

first disgorge all benefits either already received or due to be received under the terms of the settlement." *Adams*, Omnibus Order on Magistrate's Report and Recommendations, at 26 (S.D.Fla. Jan. 29, 2001). As stated previously, plaintiffs have not done so and yet nonetheless wish to proceed with this collateral attack on the substance of the settlement agreement. Unfortunately for the plaintiffs, they cannot now retain the proceeds of the settlement and press a collateral attack on the agreement's terms.[19]

## VIII. *Conclusion*

As this Court made clear in its May 14, 2001, Order, "*[a]ny* claim asserted in any of the prior three complaints, that has been reasserted in the third amended complaint and attacked by pre- or post-answer motion to dismiss, will be subject to dismissal with prejudice." However, because this Court liberally granted leave to amend the complaint numerous times over the course of this litigation, we never squarely addressed the complaint's allegations and the defendants' motions to dismiss. This was the first opportunity to do so. Therefore, this Court feels that a blanket dismissal with prejudice at this time is not warranted. Based upon this and the foregoing discussion, it is hereby

ORDERED AND ADJUDGED:

1) The Ruden McClosky defendants' motion to dismiss the Third Amended Complaint (DE# 122) is DENIED as to Count I.

2) Because the complaint does not allege disparate treatment committed by the Bellsouth defendants, the Bellsouth defendants' motion to dismiss (DE# 110) is GRANTED as to Count I. However, the Court wishes to make clear that this count is DISMISSED WITHOUT PREJUDICE.

3) The Bellsouth defendants' motion to dismiss Counts II–VII is GRANTED. These counts are DISMISSED WITH PREJUDICE.

4) The Ruden McClosky defendants' motion to dismiss counts II–VII is GRANTED. These counts are DISMISSED WITHOUT PREJUDICE.

5) The Ruden McClosky defendants' motion to dismiss is DENIED as to Counts VIII and IX.

5) The Bellsouth defendants' motion to dismiss is GRANTED as to Counts IX and XV. Because Florida's litigation privilege affords these defendants absolute immunity regarding these allegations, these counts are DISMISSED WITH PREJUDICE.

---

**19.** The "fraud upon the court" argument that the plaintiffs assert in support of their bringing an independent action to attack the settlement, *see* Pls.' Resp. to Bellsouth Defs.' Mot. to Dismiss 3d Am. Compl. at 25, does not change this discussion. As was the situation in the case plaintiff cites in support of this argument, *SEC v. ESM Group, Inc.*, 835 F.2d 270 (11th Cir.1988), "[t]he fraud alleged in the present case 'primarily concerns the two parties involved' and does not threaten the public injury which is the concern of fraud on the court." *Id.* at 273, *quoting Traveler's Indemnity Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir.1985) (per curiam). Therefore, this argument in support of performing an end-run around the terms of the settlement agreement's release provision fails as well.